Les Vela v. Waco ISD















IN THE
TENTH COURT OF APPEALS
 

No. 10-00-187-CV

Â Â Â Â Â LES VELA,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellant
Â Â Â Â Â v.

Â Â Â Â Â WACO INDEPENDENT SCHOOL DISTRICT,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellee
 

From the 74th District Court
McLennan County, Texas
Trial Court # 95-3214-3
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
DISSENTING OPINION
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â Â Â Â Â Â In this case we have two administrative processes the Texas Supreme Court has characterized
as âmandatory and exclusive.â Both administrative processes initially appear to apply to this case. 
The majority has attempted to resolve this apparent conflict by determining which process is more
specific. I believe the correct answer and result is determined through a different analysis.
BACKGROUND
Â Â Â Â Â Â The pertinent facts are as follows:
Â Â Â Â Â Â 1. Vela alleges that she lost her position as a public school principal due to discrimination. 
She alleges both race and sex discrimination.
Â Â Â Â Â Â 2. Vela pursued a grievance through the administrative grievance procedure. Her grievance
proceeded through the administrative process until her âPetition for Reviewâ was pending before
the State Commissioner of Education.
Â Â Â Â Â Â 3. In April of 1995, Vela filed a motion to abate the administrative proceeding before the
State Commissioner of Education. Vela made the following representations in her motion:
Petitioner has requested a Notice of Right to Sue from the Equal Employment
Opportunity Commission, based upon a complaint filed more than 180 days before the
request. EEOC staff have advised counsel for petitioner and respondent that the request
has been forwarded to Washington, D.C. for final action by the Department of Justice.
Â 
Upon receipt of the Notice of Right to Sue, petitioner intends to file a cause of action
in federal court in Waco. Pending that action, petitioner requests the Commissioner to
abate her appeal.

Â Â Â Â Â Â 4. Waco ISD responded that conditioned upon the representations quoted above, Waco ISD
did not oppose the motion to abate the administrative proceeding.
Â Â Â Â Â Â 5. The abatement of the administrative proceeding was granted and later extended.
Â Â Â Â Â Â 6. While the administrative proceeding was still pending, Vela filed suit in a state district
court.
THE ISSUE
Â Â Â Â Â Â Vela contends it is illogical that she would be required to exhaust two administrative
proceedings before she can bring a claim against a public school system for a violation of the
Texas Commission on Human Rights Act (TCHRA). She is correct that the Texas Education Code
(TEC) has an administrative process that must be exhausted before she can pursue litigation against
the public school system. Tex. Educ. Code Ann. Â§ 11.13 (amended 1995) (current version at
Tex. Educ. Code Ann. Â§ 7.057 (Vernon Supp. 2001)). The Texas Supreme Court has
characterized exhaustion of this administrative process as the mandatory and exclusive manner in
which a claim may be pursued. Grounds v. Tolar Independent School Dist., 707 S.W.2d 889,
891-92 (Tex. 1986). Vela is also correct that the TCHRA has an administrative process that must
be exhausted before she can pursue a claim thereunder against her employer. Tex. Lab. Code
Ann. Â§Â§ 21.201-21.211 (Vernon 1996). The Texas Supreme Court has likewise characterized this
administrative process as the mandatory and exclusive manner in which to pursue a discrimination
claim under the human rights act. Schroeder v. Texas Iron Works, Inc., 813 S.W.2d 483, 488
(Tex. 1991) (citing Grounds, 707 S.W.2d at 891-92).
Â Â Â Â Â Â In constructing an apparent conflict, Vela and the majority have focused merely on the
language of the Supreme Court and have failed to attempt to harmonize the statutes. Neither
statute is more specific with regard to Velaâs claims than the other. One statute applies to her
specific claim because the discrimination is alleged to have been committed in connection with a
public school. The other statute applies to her specific claim because it is a discrimination claim. 
Thus, Velaâs claim falls into the area of overlap between these two equally specific statutes. 
Given the noble legislative purpose of keeping our public school system âas far as possible out of
courtsâ we should not be so quick to find a conflict between these statutes.
Â Â Â Â Â Â There is nothing inherently in conflict with the requirement of imposing two procedural
hurdles if, due to the nature of the claim, it falls within special procedural provisions of two
statutes. See Turner v. Richardson Independent School Dist., 885 S.W.2d 553, 562 (Tex.
App.âDallas 1994, writ denied). While compliance with the TCHRA may be the only way to
bring a claim under that statute, and to that extent compliance is the âmandatory and exclusiveâ
way to bring such a claim, it does not mean that other procedural barriers cannot be imposed. 
Likewise, the TEA provided for an administrative review before resort to the courts. There are
many Texas cases that have held that exhaustion of this administrative remedy is the only way to
bring such a claim, i.e. it, too, is mandatory and exclusive.
Â Â Â Â Â Â The majority has expanded the Supreme Courtâs meaning of the term âexclusiveâ when used
in the context of the TCHRA to mean, not only that it is the only means by which such a claim
can be brought, but also that no other statute can be applicable. Just because one set of statutory
hurdles is the exclusive manner of bringing a particular claim, does not mean that statute makes
all other statutes inapplicable. In contrast to the way these statutes are worded, one example of
a statute that does exclude all others is ERISA, the Employment Retirement Income Security Act,
which preempts all other potentially applicable laws. Vela does not argue the TCHRA preempts
all other statutes.
LEGISLATIVE SOLUTION
Â Â Â Â Â Â When a potential conflict exists between two legislative remedies, the first thing we should
search for is something in the statute which may resolve the apparent conflict. Turner, 885
S.W.2d at 562. When we examine these statutes, we find just such a provision. Apparently
anticipating a potential for overlapping application, the legislature has resolved the issue by putting
the litigant to an election of remedies. The TCHRA contains the following provision:
A person who has initiated an action in a court of competent jurisdiction or who has
an action pending before an administrative agency under other law or an order or
ordinance of a political subdivision of this state based on an act that would be an
unlawful employment practice under this chapter may not file a complaint under this
subchapter for the same grievance.

Tex. Lab. Code Ann. Â§ 21.211 (Vernon 1996) (emphasis added).
Â Â Â Â Â Â Vela argues that â...she has exhausted her administrative remedies under the Education Code
because she is prohibited by the TCHRA, Â§ 21.211 from pursuing any other action....â She relies
on TEC Â§ 11.13 which states that the TEC does not â...deprive any party of any legal remedyâ
as confirmation of her right to bring this suit for discrimination under the TCHRA.
Â Â Â Â Â Â Velaâs reliance is misplaced. It is, as she stated earlier in her brief, TCHRA Â§ 21.211 that
prohibits her from pursuing any other action, not the Education Code. Thus, the TEC is not
depriving her of any other remedy in violation of Â§ 11.13. Clearly aware of the election of
remedies required by TCHRA Â§ 21.211, Vela attempted to simultaneously pursue two state
remedies for the same act. This is what Vela is specifically prohibited from doing by TCHRA Â§
21.211. See Schroeder, 813 S.W.2d at 486-87. If the TCHRA preempted other forms of relief
for the same act, there would be no reason to include an election of remedies clause in the Act. 
The inclusion of this provision negates any suggestion the legislature intended the TCHRA to
preempt any other form of relief.
APPLICATION 
Â Â Â Â Â Â Vela had a claim pending under the TEC before the Commissioner of Education while
attempting to pursue a TCHRA claim in state court. The statute prohibits simultaneous pursuit
of these remedies. The trial court had no jurisdiction to proceed with Velaâs discrimination claim
and properly granted the plea to the jurisdiction.
Â Â Â Â Â Â Because jurisdiction had been properly challenged, Vela was required to show the trial court
had jurisdiction of the TCHRA claim. Thus, even if Vela was not required to exhaust her
administrative remedies under the TEC, she has failed to demonstrate that she had not elected to
pursue a remedy under the TEC at the time she had filed her TCHRA discrimination complaint
and thereby foreclosed the trial courtâs jurisdiction under the statutory election of remedies
provision of the TCHRA. Further, the record only shows that Vela may have exhausted her
remedies with the EEOC, not the administrative procedures necessary to pursue a state TCHRA
claim. See Williams v. Northrop Grumman Vought, No. 05-99-01314-CV (Tex. App.âDallas,
July 10, 2001, no pet. h.) (noting that an EEOC right to sue letter is not interchangeable with a
TCHRA right to sue letter for purposes of filing a civil action); see also Jones v. Grinnell Corp.,
235 F.3d 972 (5th Cir. 2001) (applying Texas law, the court held exhaustion of only EEOC
administrative remedies does not give trial court jurisdiction under TCHRA).
SUMMARY
Â Â Â Â Â Â This case presents a classic example of why the legislature put the litigant to an election of
remedies. The alleged improper conduct in this case occurred over seven years ago. The purpose
of both administrative proceedings, as acknowledged by the majority, is to encourage a quick
disposition of this type dispute. But during this case, for a period of over six months, both
proceedings were abated at the same time. As a result of attempting to simultaneously pursue
remedies in these two forums, this case has lingered in our court system for far too long. 
Â Â Â Â Â Â Apparently when the dual forums were initially pursued by Vela, she anticipated bringing her
discrimination claim in federal court. This would not have triggered the election of remedies
requirement of TCHRA Â§ 21.211. See Texas Educ. Agency v. Cypress-Fairbanks I.S.D., 830
S.W.2d 88, 91 (Tex. 1992). Having elected to proceed under the Education Code, Vela closed
her alternative for an action in state court.
Â Â Â Â Â Â Because the majority concludes that she is not precluded from pursuing her state court option,
I respectfully dissent.
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â TOM GRAY
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice

Dissenting opinion delivered and filed January 30, 2002
Publish



   A.Â Â Â Â Â  Two
doors for a Camero and both were closed.Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
Two doors shut.Â  Were the windows up or down?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Always
on the passengerÂs side up and I had a crack.Â  ThatÂs what I was doing Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  when
I was sitting out there.Â  I was smoking a cigarette and I had a crack to, Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  you
know, get the smoke out.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
So during the time period that you were calming down, you were Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  smoking
a cigarette?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  (Nodded
head.)

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  And
the window was down.Â  Can you show the jury, using your hand, Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  approximately
how far down your window was?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Just
enough to get the smoke out.Â  IÂm in there smoking.Â  A Camero is a small Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  car,
so about like so. (Indicating.)

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  So
about four or five inches?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Well,
whatever that is.Â  (Indicating.)Â  A couple.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  When
your husband came out, had you finished your cigarette?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Where
was the cigarette?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Out
the window.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  After
you finished your cigarette, did you roll the window up?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  No,
because this is Â by the time IÂm thumping the cigarette out to prepare Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  myself
to go in the house, you know, I hadnÂt had a chance to roll anything up.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  When
your husband came out then, of the house, the window was partially Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  down?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  You
know.Â  (Indicating.)

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  The
same amount as you said before, four or five inches?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  However
much that is.Â  (Indicating.)Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
You didnÂt change the position of the window when your husband came Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  out?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Not
at that point.Â  No.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  What
happened next?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  He
came down the ramp and he was saying something to me and Â

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  What
was he saying to you?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  The
gist of it is he wanted me to come in the house.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
Well, can you tell me his exact words that he used, please?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Oh,
God.Â  You know, anything, ÂWhat you think you doing?Â  Come in the Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  house.Â
Â You know, sort of like that.Â  I was Â

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  I
mean, did he curse?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  He
used Â he Â no.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  I
mean, I donÂt hear any cuss words because you have to understand where my Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  mind
still was.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  So
if he cursed, you donÂt know?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  (Shook
head.)Â  At that point, IÂm Â he could have been, but I am in a state.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
Did he Â what Â where in the yard was your husband as he spoke to you?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  He
was still on the ramp.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  He
was still on the ramp?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.Â 
He was still on the ramp when he was talking to me and IÂm parked there.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
Is the ramp at the back door?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.Â 
The ramp is like youÂre going toward the car.Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  How
far away from you was he when he spoke with you?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Okay.Â 
Well, the car was parked Â the car was parked Â the end of my ramp is Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  probably
right there behind your chair.Â  The ramp.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  So
from you to me?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Uh-huh.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Is
that about how far yÂall were when he was speaking with you?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  And
did he ever get closer to you?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
How did he come closer to you?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  He
was headed toward the car, coming toward the car.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  And
was he saying anything as he came towards the car?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Whatever
he was saying, I was saying something at this point.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  So
youÂre both arguing then?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Well,
I was saying, I Â you know, ÂI donÂt want to talk.Â  YouÂve got nothing to Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  say,Â
sort of.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Because
youÂre still upset about the girl being there?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
What happened next?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Okay.Â 
He was coming toward the car and IÂm Â IÂm shouting, you know, ÂI Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  donÂt
hear you.Â  I donÂt want to hear you.ÂÂ  And I crank up my car.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  So
you turned your car on?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.Â 
IÂm cranking it up.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  IÂm
not going to hear him.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
What happened next?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  He
comes over and says something.Â  And the next thing I know, he sticks his Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  hand
in the window Â or trying to put his hand in the window to undo my Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  thatÂs
what he was hollering, ÂUnlock the door.Â  Unlock the door.ÂÂ  And I Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  wasnÂt
having him unlocking the door.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  What
type of locks did you have?Â  Were they power locks or Â

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.Â 
Power.Â  So he was trying to reach that but he couldnÂt get in.Â  His arms Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  are
too big.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  What
happened next?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  So
when I see that his handÂs coming in trying to reach for that, you know, IÂm, Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  you
know, hitting his hand.Â  And I threw my car in reverse.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  So
you were trying to keep him from unlocking the door?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  And
I did not want him to hit that lock.Â  IÂm moving him and trying to hit the Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  lock
myself.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Why
did you not want him to unlock the door?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  I
was not going to listen to Â I mean, thereÂs nothing he could tell me at that Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  point.Â 
If he Â if I had, you know, some time to cool down or anything, then I Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  would
listen to him.Â  But this was not the time.Â  I didnÂt Â he couldnÂt talk to Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  me.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Was
he able to unlock the door?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  No.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
What was he able to do?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  He
was able to hang on for dear life because I took that Camero and I went to Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  the
end of my driveway.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  So
you went in reverse first?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Oh,
yeah.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  And
after you went in reverse, which direction did you go?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  I
came to a screaming halt at the end of Orchard Lane right there, threw it in Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  drive,
spin all the way around to the front part of my house like a mad woman, Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  but
Â and when I came to the curb down there, came to a screaming halt.Â  The Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  next
thing I knew I saw a body.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
When you went in reverse, where was the defendant.

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  One
thing for sure, his hand was in Â was in my car.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Did
you realize his hand was in the car when you went in reverse?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes,
because IÂm fighting like this here to raise the window up.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
And then at some point you quit going in reverse?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
And then you put it in drive?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  From
reverse, I hit drive.Â  Yes.

Â 

(R.R.,
Vol. 3, p.89, l.9-p.93, l.1)

Â 

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  So
when you went from reverse to drive, what was your purpose for doing that?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Kill
him.Â  Not kill, murder, murder, but he had me in a state of mind and I Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  didnÂt
care at that point.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Was
he hanging onto your hair?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  If
he was, thatÂs the only thing that saved him.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  What
did you do next?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  When
I hit drive, I spun around all the way around you know, in the driveway Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  of
my Â of the front of my yard, came to that screaming halt, slammed on my Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  brakes,
you know, and IÂm telling you, the next thing I saw was a body.Â  Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Wherever
he was, he had come loose then.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  So
you drove through your yard?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Oh,
yeah.

Â 

(R.R.,
Vol. 3, p.93, l.25-p.94, l.13)

Â 

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
And you previously testified that he had his arm in the car; is that Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  correct?Â 
That the defendant has his arm in the car?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
So how is it that your braids came out?Â  Did they just come out Â they Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  just
fell out or did he yank the braids out of your hair?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  No.Â 
I was trying to explain.Â  I donÂt know when he grabbed my hair.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
I know you donÂt realize during this time period when he grabbed your Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  hair,
but did he grab your hair?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  IÂm
going to assume so because I do have missing braids.

Â 

(R.R.,
Vol. 4, p.12, l.4-16)

Â 

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Did
it hurt when the braids were forced out?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  I
donÂt know when they came out.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
But did it hurt?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Nope.

Â 

(R.R.,
Vol. 4, p.14, l.3-6)

Â 

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  And
now youÂre saying you donÂt know if it hurt or not?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  MaÂam,
I was too hyped up, hurt.

Â 

(R.R.,
Vol. 4, p.14, l.23-25)

Â 

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  When
you went to SkinnyÂs at around 10:16, based on Â IÂm sorry, about Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  yeah,
10:16 you went to SkinnyÂs, 10:11 or 10:16, were you upset?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  IÂm
afraid so.Â  Yes.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
Had you been crying?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Probably.

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â 
Did your head hurt at that point?

Â 

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  No.

Â 

(R.R.,
Vol. 4, p.15, l.22-p.16, l.4)









[1]
Â A portion of the victimÂs testimony is
attached as Appendix 1 to this dissenting opinion.Â  In addition to the
testimony from the victim, the jury also heard the police officer testify
regarding her holding her head when she was first seen approaching the
officers, and that the spot was red.Â  Also, the jury had before it a picture of
her head on the night of the argument and photographs of the three braids, or
Âdreds,Â found in the front yard of her home where the argument and altercation
with the defendant occurred.